CHOUTEAU & Others *v.* BARLOW, Executor and Trustee.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Argued January 10th, 11th, 1884.—Decided January 28th, 1884.

The decree of the Circuit Court was reversed on a question of fact, as to whether an agreement of a certain character was made between the copartners in a firm, on its dissolution, as to the interest which the copartners should have in the future in a portion of its assets.

*Mr. Melville C. Day* and *Mr. Roscoe Conkling* for appellants.

*Mr. W. D. Shipman* and *Mr. W. P. Clough* for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The bill of complaint in this case was filed in January, 1876, in the Circuit Court of the United States for the District of Minnesota, by Samuel L. M. Barlow, sole surviving executor of the last will, and trustee of the estate, of John F. A. Sanford, deceased (his co-executor and co-trustee, Frederick C. Gebhard, having died in 1867), and the widow and two of the three children of Sanford, as plaintiffs, against the following defendants: Charles P. Chouteau and Julia Maffitt, the heirs at law and legatees and devisees of Pierre Chouteau, Jr., deceased; the executors of the will of said Pierre Chouteau, Jr.; the heirs at law and legatees and devisees of John B. Sarpy, deceased; the executors of the will of said Sarpy; the widow and residuary legatee and devisee of Joseph A. Sire, deceased; the sole surviving executor of the will of said Sire; Benjamin C. Sanford, the other child of Sanford; and numerous persons alleged to claim an interest in some of the land which is the principal subject of the suit. The averments of the bill, so far as they are material, are as follows: Pierre Chouteau, Jr., Sarpy, Sire and Sanford, in 1842, formed a copartnership, under the firm name of P. Chouteau, Jr., & Co., for the purpose of dealing in real and personal property at St. Louis, Missouri, and in the region of country lying to the northward of that city. The capital was to be furnished, and the profits and losses were to be shared, by the several copartners in the following proportions: Chouteau, 58 per cent.; Sarpy, 16; Sanford, 16; Sire, 10. In 1849 a change was made, whereby the assets were to be owned, and the profits and losses to be shared, in the following proportions: Chouteau, 48; Sarpy, $17\frac{1}{3}$; Sanford, $17\frac{1}{3}$; Sire, $17\frac{1}{3}$. In 1852, the copartnership was dissolved by mutual consent. During its existence, it bought and paid for, with copartnership funds, acre lands and town lots in Wisconsin and Minnesota, to hold and sell for the profit and benefit of the copart-

nership, and among them certain lots named in schedules to the bill. As to some of the lots the title was taken in the name of one Borup, and, in September, 1855, he and his wife conveyed the same to said copartnership, with other lands belonging to it, which he held in the same way. As to others of the lots, the title was taken in the name of one Sibley, and, in September, 1855, and February, 1856, he and his wife conveyed the same to said copartnership, with other lands belonging to it, which he held in the same way. In March, 1857, one Robert conveyed to said copartnership other land in St. Paul, Minnesota, which it then purchased and paid for with copartnership funds. Besides the land named in schedules to the bill, town lots in various towns and villages, and acre lands in various counties in Minnesota, were purchased and paid for by said copartnership, and conveyed to it by deeds. The property so conveyed to it was the property of its said members, in the proportions last mentioned. Sire died in 1854 and Sarpy and Sanford died in 1857. In December, 1859, Benjamin C. Sanford released to the widow and the other two children of his father all his interest in the estate of his father. Pierre Chouteau, Jr., died in 1865.

The bill then contains the following averments, which set forth the particular question in controversy :

"The said copartnership was dissolved by the said John F. A. Sanford, deceased, retiring therefrom, and removing from St. Louis, where he then resided, to the city of New York, to there reside and carry on business in copartnership with the said Pierre Chouteau, Jr.; and, as your orators are informed and believe, it was agreed upon between the said Sanford and the other three copartners, and particularly the said Pierre Chouteau, Jr., as one of the conditions of the withdrawal of the said Sanford from the copartnership, that he, the said Sanford, should release to the said Chouteau all his interest in and to the assets of the said copartnership, except the lands and town lots thereof in Minnesota ; and that, in consideration thereof, and of his withdrawal from the said copartnership, the said Chouteau should save him, the said Sanford, harmless on account of the debts of the said copartnership, and should assure to him, free from any debt or liability growing out

of the copartnership affairs, the share of him, the said Sanford, in and to the said lands and town lots, being seventeen and one-third one-hundredth (17⅓-100) parts thereof. In pursuance of such agreement the said Sanford did, as your orators are informed and believe, upon the dissolution of the said copartnership, and as part of the arrangement between the copartners for such dissolution, release to the said Pierre Chouteau, Jr., all his interest in the assets of said copartnership, except in the said lands and town lots ; and the said Chouteau afterward, and in his lifetime, realized all said assets so released, and applied them to his own use."

The gravamen of these allegations is, that Pierre Chouteau, Jr., took from Sanford a release of all his interest in the copartnership assets, except the lands and lots in Minnesota, and was to save Sanford harmless from all debts of the copartnership, and Sanford was to have his 17⅓ per cent. of the said lands and lots, free from any debts or liability growing out of the copartnership affairs; and that Pierre Chouteau, Jr., realized all the assets so released and applied them to his own use. It is to enforce this claim to the proceeds of the Minnesota lands and lots, free from the debts of the copartnership, that this suit is especially brought.

The bill then sets forth the following matters : On the dissolution of the St. Louis copartnership, Sanford removed to the city of New York, and there engaged in business in copartnership with Pierre Chouteau, Jr., under the firm names of Pierre Chouteau, Jr., & Co., and Chouteau, Sanford & Co., in which copartnership he continued to carry on business until his death. After the death of Sanford, and after the issuing to Messrs. Gebhard and Barlow of letters testamentary on his will, and in November, 1859, Pierre Chouteau, Jr., and Messrs. Gebhard and Barlow, as such executors and trustees, entered into an agreement or compromise concerning all the mutual dealings between Chouteau and Sanford in relation to the business of the New York firms, and concerning all indebtedness and liability of every nature and kind of Sanford to Chouteau. By the terms of said agreement or compromise Messrs. Gebhard and Barlow were to release to Chouteau all the interest of Sanford in the assets of the New York firms,

and, in consideration thereof, Chouteau was to release to Messrs. Gebhard and Barlow, and to the heirs and legal representatives of Sanford, all claims and liabilities against Sanford or his estate, due or owing, or to become due or owing, to Chouteau, on account of any prior transactions between them. Upon the making of such agreement or compromise, Messrs. Gebhard and Barlow submitted the same to the Surrogate of the county of New York, and he, on November 25th, 1859, made an order allowing the agreement or compromise to be entered into and carried out. Afterwards, and on December 1st, 1859, Messrs. Gebhard and Barlow, to carry out said agreement or compromise, signed, sealed, and delivered to Pierre Chouteau, Jr., their deed, whereby they, as executors and trustees, released to him all the right, title, and interest which Sanford at the time of his death had in or to the assets of the New York firms; and Chouteau, on the same day, in pursuance of said agreement or compromise, and to carry it out on his part, signed, sealed, and delivered to Messrs. Gebhard and Barlow his deed, releasing the heirs, next of kin, legatees, devisees and legal representatives of Sanford from all causes of action, claims and demands, in law or equity, which he, Chouteau, ever had, or which he, his heirs, executors or administrators thereafter could or might have, against Sanford or against his heirs, next of kin, devisees, legatees, executors or administrators, by reason of any matter whatsoever.

The bill further avers, that no accounting or settlement of the affairs and business of said St. Louis copartnership had ever been had except as was thereinbefore stated. It further alleges as follows: Since the death of the four copartners, the defendants C. P. Chouteau and Mrs. Maffitt, claiming, as the heirs at law and devisees of Pierre Chouteau, Jr., to own all the said real estate of the copartnership, sold and conveyed to various persons certain of said lots and lands, and received therefor large sums of money, without the knowledge or consent of the heirs, devisees or legal representatives of Sanford, and in fraud of their rights, and for less than one-half of the actual value, at the time of sale, of the property sold, and for the purpose of defeating the rights of the plaintiffs in the

property, leaving certain lands and lots unsold; and that those made defendants as claiming an interest in some of the lots of land took such interest through conveyances from the defendants C. P. Chouteau and Mrs. Maffitt, with notice that the lots belonged to the heirs, devisees and legal representatives of Pierre Chouteau, Jr., Sire, Sarpy and Sanford, and not merely to their grantors, and with notice that the plaintiffs, as the successors in interest of Sanford, were the owners in fee simple of an undivided 17⅕-100th parts of said lots.

An answer on oath is waived. The prayer of the bill is (1) that the defendants may account touching the affairs and property of said copartnership and touching the proceeds of any of such property; (2) that there may be set off to the plaintiffs, as of the estate of Sanford, 17⅕-100th parts of the unsold lots described in the schedules to the bill, and of any other real property owned by the St. Louis copartnership, that had not been sold and conveyed by C. P. Chouteau and Mrs. Maffitt to parties other than the heirs, legatees and legal representatives of Sire and Sarpy, or to other parties for their use and benefit; (3) that the plaintiffs recover from C. P. Chouteau and Mrs. Maffitt, as part of the estate of Sanford, 17⅕-100th parts of the sums, whether in money or securities, received by them as the prices of the lands and lots so sold and conveyed by them, other than the lots and lands described in said schedules; that, for the amount of the plaintiffs' share of said money and securities, they be adjudged to have a lien on the interest of C. P. Chouteau and Mrs. Maffitt in and to the lots and lands described in said schedules; and that such interests be sold to satisfy such lien.

C. P. Chouteau and Mrs. Maffit, and the executors of Pierre Chouteau, Jr., the executors of Sarpy, the widow of Sire, his surviving executor, and Benjamin C. Sanford, put in a joint and several answer to the bill, not on oath. It denies that the copartnership bought or paid for with copartnership funds the lands referred to in the bill, for the purpose of holding or selling the same for its profit or benefit; but avers that all lots or lands, whether described or not in the bill or its schedules, which were held or owned by said copartnership at its dissolution,

were taken in payment of, or in settlement or compromise of, indebtedness due to it from persons then indebted to it, and not otherwise ; and that all lots and lands held by it at the date of its dissolution were a part of its assets at that date, and were chargeable with the payment of its debts. It denies that the property mentioned in the bill as acquired by Borup was acquired by him for the benefit of said copartnership, and avers that he purchased said property and took the conveyance thereof in his own name, without the consent or knowledge of said copartnership, and conveyed the same to the new copartnership, formed after the dissolution, in settlement of his indebtedness, owing to said new copartnership. It denies that the title to the property mentioned in the bill as acquired by Sibley was taken in his name for the benefit of said copartnership, and avers that the property was received from Sibley in settlement of indebtedness owing to the new copartnership formed after the dissolution. As to the town lots and acre lands mentioned in the bill as being additional to the land named in the schedules to the bill, and owned by said copartnership prior to its dissolution, the answer avers that all those lots and lands were firm assets, taken, in the ordinary business of the firm, in payment or settlement of indebtedness theretofore owing to it. It denies that any part of the lots or lands referred to in the bill as having been conveyed after the dissolution of the firm was intended to be conveyed to any firm in which said Sanford was a member or interested. It then alleges as follows :

" On the contrary thereof, these defendants say, that, on the 31st day of December, 1852, said copartnership in said bill of complaint named was duly dissolved, and said John F. A. Sanford withdrew therefrom, and then and there, for a valuable consideration to him paid by said Pierre Chouteau, Jr., did sell, assign, transfer and set over unto the said Pierre Chouteau, Jr., all and singular his share and interest in and to the assets of said partnership, of all and every kind and description whatsoever, including his interest (if any he had) as a member of said firm, in and to the said lots and lands in said bill of complaint described, and all and every part and parcel thereof, and from thenceforth said Sanford

never had or claimed to have any interest in, or right to a share in, the proceeds of said lands or lots ; and that, after the withdrawal of said Sanford from said copartnership, the business theretofore transacted by said-copartnership at St. Louis and in Minnesota was continued by said Pierre Chouteau, Jr., John B. Sarpy and Joseph A. Sire, under the same firm name of Pierre Chouteau, Jr., & Co., and all conveyances of land taken in such firm name, from and after the dissolution aforesaid, in any manner or for any purpose, were taken solely and exclusively for the benefit of said three last-named parties, as such firm, and not otherwise."

It denies that the agreement between Sanford and the other members of said copartnership, on its dissolution, is correctly stated· in the bill, and avers that such agreement was, that, in consideration that Chouteau should save Sanford harmless on account of the debts of the St. Louis copartnership, Sanford would and did release and transfer to Chouteau all his interest in the assets and property of said copartnership, including his interest, if any, in said lands and town lots in Minnesota. It denies that Chouteau at any time agreed to assure to Sanford, free from any debts or liabilities growing out of said copartnership affairs, 17½-100ths, or any part, of said lands or lots in Minnesota. It avers that, by the deed of December 1st, 1859, named in the bill, executed by Chouteau to the plaintiffs, he expressly reserved his right to collect and dispose of, for his own use and benefit, all the assets of the dissolved St. Louis copartnership, in accordance with the transfer thereof to him by Sanford, before set forth in the answer. It avers that the copartnership, at the time of its dissolution, was indebted in the sum of $438,176.28; that the assets of the firm, exclusive of the interest, if any, of the copartnership in lands and lots in Minnesota and elsewhere, was insufficient to liquidate said indebtedness; that, on May 1st, 1860, there still remained an indebtedness of more than $212,000, which was advanced and paid by Pierre Chouteau, Jr., in his lifetime, with the assent of the executors of Sarpy and Sire; that it was agreed by those executors, that the amount of such indebtedness for which their estates were severally liable should be refunded to Chou-

teau from the proceeds of the sale of the unsold lands and lots in Minnesota; that this arrangement was not carried into effect during Chouteau's lifetime; that Charles P. Chouteau and Mrs. Maffitt subsequently sold and disposed of the remaining lands and lots and used the entire proceeds thereof to pay to themselves, as the heirs at law and sole legatees of Pierre Chouteau Jr., the amount remaining due to them by reason of his payment of said copartnership indebtedness; that the sales so made are the same sales mentioned in the bill; and that they were made at public auction, in good faith, for the full value of the lands and lots at the time, after having been duly advertised, and with the full knowledge of the plaintiffs. The answer further avers, by way of defence, that more than six years have elapsed since the accruing of any of the alleged causes of action set out in the bill.

After a replication to the answer, proofs were taken, and, after a hearing, the court made the following interlocutory decree, on August 13th, 1878:

"1. I find that, in 1852, the firm of P. Chouteau, Jr., & Co., No. 2, consisted of four persons, and the assets of the copartnership were owned, and the profits and loses were to be shared, in the following proportions: Pierre Chouteau, Jr., 48 per cent.; John B. Sarpy, 17⅓ per cent.; John F. A. Sanford, 17⅓ per cent.; Joseph A. Sire, 17⅓ per cent. 2. That the copartnership was dissolved in 1852, by the mutual agreement of all the parties. 3. That a large amount of real property was owned by the copartnership in the Territory (now State) of Minnesota, at the time of the dissolution, having been purchased with copartnership funds. 4. That the legal title to the property was at that time in Charles W. Borup and H. H. Sibley, persons acting for said copartnership, and was by them, in 1855, conveyed to the firm of Pierre Chouteau, Jr., & Co., composed of Chouteau, Sire, Sarpy, and Sanford; and also, in 1857, other real property, mentioned in the bill of complaint, was purchased for the benefit of the copartnership. 5. That, at the time of the dissolution of said copartnership, it was agreed between John F. A. Sanford and the other partners, *inter alia*, that he, the said Sanford, should release to Chouteau all his interest in and to the assets of the copartnership, except the real

property in Minnesota, and that, in consideration thereof and of his withdrawal from the said partnership, the said Chouteau should save him, the said Sanford, harmless on account of the said copartnership, and should assure to him, free from any debt or liability growing out of said copartnership affairs, the share of him, the said Sanford, in and to said real property, lands and town lots, being 17⅓-100th parts thereof.  6. That, in pursuance of the agreement, Sanford released his interest in the assets to Chouteau, except the lands and town lots, and during his lifetime Chouteau realized all the said assets.  7. That Sire died in 1854, Sarpy in 1857, Sanford in 1857, and Pierre Chouteau, Jr., in 1865, all leaving heirs, devisees and legal representatives, and there never has been any accounting of the business of the copartnership, except as stated in the bill of complaint, which is referred to.  8. That since the deaths of the said Sire, Sarpy, Sanford and Chouteau, and in the years 1866 and 1867, and since then, the defendants Charles P. Chouteau and Julia Maffitt, claiming, as the heirs at law and devisees of the said P. Chouteau, Jr., to be owners of said real property in Minnesota, town lots and lands, have sold property outside of the city of St. Paul, in Minnesota, and have received large sums in money and securities, and have also sold and conveyed to various persons, including the several defendants mentioned specially in the bill of complaint as purchasers, a large amount of property situated in the city of St. Paul aforesaid, and received therefor a large amount of money and securities, without the consent of the heirs or representatives of said Sanford, and without paying or tendering to them any part or portion thereof.  9. That the amount of real property remaining unsold, which was conveyed by said Borup and Sibley to the firm of P. Chouteau, Jr., & Co., and purchased for the benefit of the partnership, is large and of sufficient value to meet any and all claims made by complainants on account of the sale and conveyance of the property to the defendants named as purchasers in the bill of complaint, and admitted in the answer.

*Conclusions.*  By the terms of the dissolution of the copartnership of P. Chouteau, Jr., & Co., No. 2, Sanford was to retain his interest in the Minnesota real estate, being 17⅓-100th parts thereof; and the complainants, as the representatives of the estate of John F. A. Sanford, are entitled : 1st. To 17⅓-100th parts of all the real estate mentioned in the bill of complaint, or

in the schedules attached thereto, not sold to parties other than the representatives of Pierre Chouteau, Jr., Sarpy and Sire. 2d. It is ordered that an account be taken of all the real estate sold since the dissolution of the firm of P. Chouteau, Jr., & Co., by the retirement of J. F. A. Sanford, to parties other than the representatives of the said partners. 3d. That, in stating said account, the lands and town lots sold to third parties in 1866 and 1867 be valued at their present value, less improvements made by the purchasers. 4th. That in said account shall be stated the amount of all the taxes paid by Charles P. Chouteau and Julia Maffitt upon the property sold, at the time of the conveyance, and also the amount of taxes paid upon the property unsold to date, and such sum as may be necessarily expended in the care and custody of the property. 5th. That, after the deduction of the taxes and the amount necessarily expended for the management of the property, and on confirmation of the master's report, 6th. It is ordered and adjudged that a decree be entered in favor of complainants, against the said defendants Charles P. Chouteau and Julia Maffitt, for the amount of 17$\frac{1}{3}$-100th parts of the remainder, which shall be enforced and satisfied out of the interest of said defendants in the real property described in the bill of complaint or schedules, unsold. 7th. That the bill of complaint against all parties defendants other than the representatives of P. Chouteau, Jr., Sarpy, and Sire, be dismissed, but without costs. 8th. That H. E. Mann, Esq., is appointed to take the account and report."

In pursuance of the interlocutory decree a hearing was had before the master, whose report was filed August 2d, 1880. Exceptions were taken by the defendants to the report of the master, as had also been done in reference to the interlocutory decree; and, on September 21st, 1880, the court made a final decree, in which it was decreed that the plaintiffs are the owners in fee simple, and are entitled to the possession, as tenants in common, of an undivided 17$\frac{1}{3}$-100ths of certain lands in Minnesota described in the decree, and that partition be made of said lands between the plaintiffs and the defendants; that Charles P. Chouteau and Julia Maffitt pay to the plaintiffs the sum of $36,646.56, being 17$\frac{1}{3}$-100ths of the value of

the lands sold by them in 1866 and in 1867; that Charles P. Chouteau individually pay to the plaintiffs $7,793.87, being 17½-100ths of the balance of the income of lands claimed to be held by him in severalty, and of the proceeds of lands sold by him since 1867; that Julia Maffitt pay to the plaintiffs the sum of $8,178,57, being 17½-100ths of the balance of the income of lands claimed to be held by her in severalty, and of the proceeds of lands sold by her since 1867; that the widow of Sire pay to the plaintiffs the sum of $1,214.08, being 17½-100ths of the income of that portion of the lands claimed to be held by her in severalty, and of the proceeds of lands sold by her since 1867; that the plaintiffs pay to the heirs and representatives of Sarpy the sum of $772.16, being 17½-100ths of the balance of expenditures over receipts on account of lands claimed to be held by the heirs of Sarpy in severalty. These different sums adjudged against the defendants, amounting to $53,833.08, are declared to constitute liens upon the property owned by them respectively. The decree further declares that the rights of the several parties in the said real estate, so far as rents, issues, and profits and expenditures are concerned, are to be regarded as having been determined by the decree only up to January 1st, 1879.

The dispute between the parties, as shown by the pleadings, is as to the terms of the agreement of dissolution of the copartnership in 1852. The plaintiffs allege in the bill, that Sanford released to Chouteau all his interest in the assets of the firm, except its lands and town lots in Minnesota, and that Chouteau agreed to relieve Sanford from the debts of the firm, and to assure to him his 17½-100ths of said lands and town lots, free from any debt or liability growing out of the copartnership affairs. The answer alleges that Chouteau agreed to relieve Sanford from the debts of the firm, and Sanford released to Chouteau all his interest in the assets of the firm, including his interest, if any, in the lands and town lots in Minnesota. The Circuit Court found the terms of the dissolution to be those alleged in the bill. The question is wholly one of fact. We are unable to concur with the decision arrived at by the Circuit Court on that question. The evidence is voluminous, and a minute dis-

cussion of it would be unprofitable. It consists of correspondence and documents and oral evidence, and we must content ourselves with indicating generally the grounds of our conclusion.

The agreement alleged in the bill is said to have been contained in two letters, one from the firm of P. Chouteau, Jr., & Co., No. 2, the firm which was being dissolved, to Sanford, and the other from Sanford to the firm, in reply, both written in 1852, at the time of the dissolution. Those letters are not produced, nor are copies of them furnished. The only witness for the plaintiffs who testifies to having seen them, or who states their contents, is Mr. Barlow, one of the plaintiffs. On his direct examination, he says that he saw them in 1858 and 1859, at the time when negotiations for a compromise were going on between Pierre Chouteau, Jr., and the executors of Sanford, in regard to the claims of Chouteau against the estate of Sanford for his share of the losses of their New York firm; and that the last time he saw them was in 1861, when the answer of the executors of Sanford was being prepared in a suit brought against them by Chouteau in a State court in Minnesota, seeking a sale of the lands in question. He states that he was cognizant for many years before Mr. Sanford's death of the existence of the contract shown by the letters, though he did not see the letters till after Sanford's death, when they were found among Sanford's papers, and were in the possession of Mr. Gebhard and the witness. That contract he states thus, on his direct examination:

"It was in the shape of a letter signed in the firm name of Pierre Chouteau, Junior, & Co., addressed to Mr. John F. A. Sanford, and responded to by him as of the same date, assenting to the terms proposed in the letter. These terms were, that from that date Mr. John F. A. Sanford should retire from all connection with the St. Louis house, with the view of establishing a house in New York in connection with Mr. Chouteau, in which neither Sarpy nor Sire would have any interest; and it was agreed that the remaining partners in the St. Louis house should be entitled to all the assets and property of that firm, should have sole

power to settle its business, that they would relieve Mr. Sanford from all liabilities and obligations connected with the St. Louis firm, and that his interest in the Minnesota lands owned by the said St. Louis firm should be retained by him absolutely."

It is alleged that the letters have been lost and cannot be found after proper search. Mr. Barlow states that the first letter was dated at St. Louis and was signed by Chouteau in the name of the firm, but was not in his handwriting; and that the other letter was signed by Sanford and may have been a signed copy of the original. On cross-examination he gives the form and language of the letters as follows:

"The first was dated at St. Louis, and addressed to Mr. John F. A. Sanford, and recited the fact that it had been agreed that from that date his interest in the firm of P. Chouteau, Junior, & Co., of St. Louis, should terminate, and that the assets and business of the firm should be continued for the benefit of the remaining partners, who agreed to assume all the responsibilities of the firm from that date, with a reservation at the close of the letter, that Mr. Sanford's interest in the Minnesota property or purchase, according to my recollection—I won't be certain whether it was property or lands—should remain in him. In one of the letters (I think the St. Louis), there was a reference to the fact that Mr. Sanford was about to or had established a firm in New York, in which Mr. Sanford and Mr. Chouteau alone were interested, to the exclusion of Sarpy and Sire. The fact appeared in the letter that a New York house was about to be established, or was established, in which Sarpy and Sire would have no interest. Sanford's response was exceedingly brief and contained merely an assent to the terms proposed or suggested in the first letter. That is as near as I can recollect the contents of the letter."

He further states, when asked "whether the reference to the Minnesota property in that letter spoke of interest in the Minnesota lands or in the Minnesota ' outfit : ' "

"I am confident that it was not 'outfit.' It was either lands or property—Minnesota lands or Minnesota property—and not 'outfit,' I am confident."

He is asked the following question: " In reference to the agreement which you have spoken of as having been made by the firm of P. Chouteau, Jr., & Co., of St. Louis, and Mr. Sanford, at the time of Mr. Sanford's retirement in 1852, had you been informed of the existence of any such agreement before the matter of the compromise was entered upon?" His reply is:

"I knew that Mr. Sanford claimed an interest in the Minnesota lands in his lifetime. I do not know that I knew of any agreement about it at that time, or had even heard about it. The simple fact was referred to, the fact of Mr. Sanford's interest in the Minnesota lands was referred to, by Mr. Chouteau, in the course of the negotiations which led to the compromise after Mr. Sanford's death. I think I saw the agreement in question at the time of the preparation of the papers executed on this compromise, but I cannot positively say that I did. My first distinct recollection of seeing the agreement in question was at or about the time of the drafting of the answer of the executors to the bill filed by Mr. Chouteau for the partition of the lands in Minnesota, to which I have testified."

It may well be questioned whether sufficient evidence was given of proper search for the letters, and of their loss, to warrant the parol evidence given of their contents. The parties who searched for the letters in the places where it was supposed they might be, were not called as witnesses, and there is no testimony as to the character or extent of the search, but only evidence by Mr. Barlow of his direction to persons to search, and his statement of his understanding of the result. There is no evidence that the letter from Sanford was ever sent. It was found among his papers after his death. On search, no such letter has been found among the papers of the firm in St. Louis, nor does their letter-book show any copy of the letter to Sanford, although many letters both to and from the firm have been produced in evidence.

In the original answer filed in June, 1861, by the executors of Sanford, and sworn to by them June 15th, 1861, in the suit brought in the State court of Minnesota, by Chouteau and the

executors of Sarpy and Sire, in February, 1861, for a sale of the Minnesota lands to pay the debts of the firm, alleged to have amounted, on May 1st, 1860, to $212,000, the claim of the executors of Sanford was stated to be:

"That, upon the retirement of the said John F. A. Sanford from the firm mentioned in the complaint, he became a partner in another firm under the same name, in the city of New York, together with the said Pierre Chouteau, Junior, in which the said Sarpy and said Sire had been theretofore partners, and in which they thereupon ceased to be partners, and said John F. A. Sanford succeeded to their interests therein, and said Sarpy and Sire succeeded to his interest in said St. Louis firm, excepting his interest in said Minnesota lands, and that, by agreement between all the parties at the time of such exchange of interests, and in consideration thereof, said John F. A. Sanford and his interest in the Minnesota lands were to be exonerated and free from all liability for the debts and liabilities of said St. Louis firm or to any of his copartners therein, and to be indemnified and saved harmless in the premises."

This allegation was explicitly denied in the reply to the answer, which reply was put in in August, 1861. In an amended answer put in by the executors of Sanford, in September, 1861, not sworn to by them, but verified by their attorney in the suit, the above statement in the original answer was repeated, and these words were added:

"And that the said John F. A. Sanford was to have and to hold in fee simple, as tenant in common, seventeen and one-third one-hundredth (17⅓-100) parts of said land to his own sole use, freed from any claim for debts of said copartnership, or any liability for contribution in favor of any of the other partners."

The complaint in the suit in the Minnesota State court, after setting forth the facts about the St. Louis copartnership, and its dissolution December 31st, 1852, avers, that during its continuance it had, at St. Paul, Minnesota, an outpost or trading-house, to which it supplied merchandise; that the business at St. Paul was conducted under the name of the "Minnesota

Outfit," debits and credits being made to it, and it was a part of the copartnership business; that the copartnership, during its continuance, acquired lands in Minnesota, described in schedules to the complaint, and they were a part of its partnership assets, the title to them being taken in the name of Pierre Chouteau, Jr., in fee, he holding them in trust for said copartners; that at its dissolution said firm had outstanding debts or liabilities to the amount of $438,176.28; that that amount had since been reduced, and, on a full and final settlement and accounting between Chouteau and the executors of Sarpy and Sire, on May 1st, 1860, it was found that the debts and liabilities of said firm then owing and unpaid, and for which said copartners, or their legal representatives, were liable, amounted to $212,000, which sum was still due and owing by them and unpaid; that the assets of said firm at its dissolution consisted of real estate and divers accounts and notes, which were of little or no value; that said real estate was the only assets belonging to said copartners with which to pay said indebtedness; that, to discharge the same, Chouteau had paid 48-100ths of said $212,000, the executors of Sarpy $17\frac{1}{3}$-100ths thereof, and the executors of Sire $17\frac{1}{3}$-100ths thereof; that neither Sanford nor his executors had paid any part of his share of said $212,000; that their neglect to pay was a violation of the terms of the copartnership agreement; and that the remaining indebtedness of the firm could not be paid without a sale of said lands and the application of the proceeds of the sale to such purpose. The prayer of the complaint was that the amount of the unpaid debts and the assets of said firm be ascertained, and a receiver of its notes, accounts and choses in action be appointed, with power to sell the same, and that said real estate be sold and the proceeds be applied to pay the debts due and owing by said firm.

The events which immediately preceded the bringing of that suit in the State court of Minnesota were these: Pierre Chouteau, Jr., had become totally blind, and his business and correspondence were conducted by his son-in-law, William Maffitt. On the 6th of August, 1860, Maffitt wrote from St. Louis to Gebhard at New York, a letter, which is not produced, but in

which, judging from Gebhard's reply to it, he appears to have informed Gebhard that there was a large indebtedness due from the firm, and to have referred to the necessity of taking steps for its payment, in reference to Sanford's proportion of it. Gerhard's reply to Maffitt, under date of New York, September 15th, 1860, was as follows:

"Yours of the 6th ult. has remained unanswered, in order that I might consult with my co-executor, with whom I have just had an interview. ·We are both much surprised to hear for the first time of the large indebtedness to which you allude, as we understood from Mr. Chouteau's agent, at the time of our settlement in December last, that the Minnesota property would probably prove very valuable, sufficiently so to return to us as executors a handsome sum, and were not advised of any charge against the property which we should have to pay. Before determining as to our course, it is necessary that we should be fully advised of the nature of Mr. Chouteau's claim, and you will please send us a copy of the accounts of firm No. 2 and firm No. 3, to which you allude, and we will examine the same with the vouchers. Please also advise us as to the situation and present value of the Minnesota property to which you allude, and be kind enough to furnish us a copy of the undertaking or agreement with Mr. Sanford, made on the occasion of his retirement from firm No. 2, to which reference is made in the release from Mr. Chouteau to us, dated December, 1859."

To this letter Maffitt replied by a letter to Gebhard, dated St. Louis, October 4th, 1860, as follows:

"I was absent when your letter of the 15th ult. was received, or it would otherwise have had earlier attention. I do not see that the opinion said to have been expressed by Mr. Chouteau's agent in regard to the value of the Minnesota property authorized the inference that there was no charge against it. But, however this may be, Mr. Thompson, at least, was well informed as to its situation. In a letter written October 6th, 1859, I mentioned that 'this interest (the Minnesota) had been retained by Mr. Sanford in the transfer between him, Mr. Sarpy and Mr. Sire, but embarrassed by a very heavy debt.' I don't, however, consider this important. The accounts you ask for are entirely too voluminous

to furnish within any reasonable time.　They embrace the largest part of the business of the house during a long period.　The books, however, are open to your inspection, and we will afford you every facility to enable you to make a satisfactory examination of them. There was no written agreement that we know of on Mr. Sanford's withdrawal from the house.　From the balance sheet made in December, 1852, it seems that the various outfits in the Upper Mississippi were indebted, in the aggregate, $438,176.28.　As it was impossible, even approximately, to determine the value of this interest, for its assets consisted principally of debts which it was very questionable at the time would ever be realized, it was concluded by the parties that Mr. Sanford should retain his interest therein.　From that time it required constant negotiations and great attention to save anything.　Finally Mr. Chouteau, by his own personal exertions, in 1855, succeeded in obtaining a settlement, the result of which was what we now have in the Minnesota property.　Mr. Chouteau's action in this matter is by no means voluntary.　It has been forced upon him chiefly by the settlement recently had with the executors of his late partners.　It was not to be expected that they would do more than pay their proportion of the amount chargeable to their property.　They were all, however, jointly liable for the whole, and in the event of Mr. Sanford's estate being unable to pay its proportion, they would have been liable for their respective proportion of its (the estate's) share of the indebtedness.　It became, therefore, incumbent on Mr. Chouteau, as surviving partner, to take the steps he now proposes, or to assume the part due from Mr. Sanford's estate.　Such an alternative is out of the question, as the debt is already very large and constantly increasing by the interest.　As regards the situation of the property at present, it is managed by Mr. Prince and Mr. Sibley.　No income whatever is derived from it, and very little expense incurred beyond the salaries of the agents.　Hoping to hear soon what your determination is in relation to this matter, I remain," &c.

The suit in the State Court of Minnesota was then brought, as stated.　Before answering the complaint Gebhard wrote to his co-executor, Mr. Barlow, a letter dated New York June 3d, 1861, which says:

"It seems to me quite important, in answering the bill filed

against us, 1. To insist on the production of the original papers executed at the time Sanford retired from the St. Louis firm. 2. To allege that Sanford sold out his interest in the St. Louis firm, with all its liabilities, to Sarpy and Sire, and assumed their positions in the New York firm, reserving for himself, individually, his share of the St. Paul property, free of all liabilities, which was simply left in Mr. Chouteau's name, partly so as not to complicate matters, as well as from the implicit trust that Sanford had in Mr. Chouteau, that everything would be properly accounted for. 3. Allege that in the transfer each party agreed to assume the outstanding liabilities. 4. When Mr. Chouteau settled with the executors of Mr. Sanford, he distinctly stated that the release covered all debts of the deceased, except a few trifling ones in New York, which the executors have paid or settled for; and that Mr. Sanford's interest in the St. Paul property would be one of the assets that would revert to the estate and to the minor children."

The suit in the State court of Minnesota proceeded no further, but was discontinued. C. P. Chouteau states that the reason for this was that the executors of Sanford renewed propositions of settlement.

In February, 1869, Mr. Barlow, as surviving executor of Sanford, brought a suit in the Supreme Court of New York, against the executors of Pierre Chouteau, Jr. The complaint set forth the facts as to the firm and its business and the interests of its partners and its dissolution, by consent, in 1852, and averred that the firm, during its continuance, purchased with its funds lands in Minnesota, described in a schedule to the complaint, the legal title to which was, for convenience, taken in the name of Chouteau; that Chouteau and his executors had sold portions of the lands, and other portions remained unsold and undivided; that no account respecting the said lands had been adjusted with Sanford or his executors; and that the plaintiff was entitled to his due share of the proceeds of the lands sold, and his due proportion of the lands unsold, being the proportion thereof in which Sanford was interested in the firm. The complaint prayed for an account of the lands and of the proceeds of those sold, and for

payment and conveyance accordingly, and was verified by Mr. Barlow. It did not refer to any agreement as having been made between Sanford and the other partners at the time of the dissolution. The answer, verified by C. P. Chouteau, referred to the "Minnesota Outfit," as a business carried on for the benefit of the firm, and alleged that, when it was dissolved, its assets consisted of notes and accounts and of the Minnesota lands; that its liabilities were then $438,176.28, and, on the 1st of May, 1860, had been reduced to $212,724.23, which amount was advanced by Pierre Chouteau, Jr., out of his individual moneys; and that the estate of Sanford was liable for its proportion thereof. It denied that the plaintiff was entitled to any of the proceeds of the lands sold, or to any part of those unsold, and prayed for an account between the parties as to the business of the firm, and that the amount owing by the plaintiff to the defendants, on account of the losses and indebtedness of the firm or otherwise, might be established and adjusted against the plaintiff. In March, 1872, a stipulation was signed by the plaintiff's attorney, agreeing to admit at the trial that the debts of the firm at the dissolution were as stated in the answer; that Pierre Chouteau, Jr., had discharged all of them with his individual moneys, and became a creditor for that amount; that, before May 1st, 1860, the indebtedness of the firm to him had been, by sales of the lands and from assets, reduced to $212,724.23; and that neither Sanford nor his executors had contributed anything thereto; but the plaintiff was not to be precluded from requiring an account of all the assets of the firm applicable to the payment of its indebtedness, and the defendants agreed to furnish it at the trial. In September, 1872, the suit was referred to a referee for trial, and there were some meetings before him. Without any conclusion, the suit was discontinued March 30th, 1876, shortly after the present suit was begun.

This history of the record evidence furnished by the correspondence and the pleadings in the suits has been given in order to show what allegations have been made in deliberate form as to any special agreement between the parties at the time the firm was dissolved. It is not unlikely that letters may have

passed between the firm and Sanford at that time, which may have expressed, as stated by Maffitt in his letter of October 4th, 1860, the conclusion of the members of the firm that Sanford should "retain his interest" in "the various outfits in the Upper Mississippi," because "it was impossible, even approximately, to determine the value" of that interest, as "its assets consisted principally of debts which it was very questionable at the time would ever be realized." The language of the letters would be very material in determining the actual agreement. A slight difference in wording might change the meaning essentially. Maffitt asserted, in his letter to Gebhard of October 4th, 1860, that the Minnesota interest, retained by Sanford at the dissolution, was "embarrassed by a very heavy debt." The letters, or copies of them, were vital to the claim of Sanford's executors, after Gebhard received this letter from Maffitt. Yet we find Gebhard, in his letter of June 3d, 1861, to Mr. Barlow, after the suit foreshadowed by Maffitt had been brought, making suggestions as to matters for the answer and as to requiring the production of papers, which are far from implying that Sanford's executors had letters in their possession which would show the agreement now insisted on. They having the letters, if the letters would show such agreement, we should expect copies of them to be set forth in the answer in the suit in the State court of Minnesota, as a copy was set forth, in both the original and amended answers in that suit, of the release of December 1st, 1859, executed by Chouteau to the executors of Sanford, on the settlement then made between them of the affairs of the New York firms in which Chouteau and Sanford were partners. Both of the answers refer to an agreement to the effect claimed, but do not state that it was in writing, and set forth only its general purport. Mr. Barlow states that he examined the letters carefully at the time the original answer in the suit in the State court of Minnesota was drawn, and that he thinks they were in the possession of his counsel, Mr. Platt, when the amended answer in that suit was drawn. The subject would naturally be revived when the suit in New York was brought, in 1869, yet we do not find in the complaint in that suit any mention of the agree-

ment claimed to have been evidenced by the letters.    The establishing in that suit, by the testimony of Mr. Barlow, of the agreement now set up, would have disposed of the controversy. Can more weight be given to his recollection seven years later, as to the contents of letters which he had last seen more than fifteen years before he testified ?    There never was any suit brought distinctly based on the agreement now set up, until the present suit, brought more than twenty-three years after the agreement is alleged to have been made, and more than fifteen years after the executors were fully notified by Maffitt, acting for and by the direction of Chouteau, of the claim made by Chouteau.    That there were some letters which Mr. Barlow saw, and the contents of which he believes he states correctly, is not to be questioned; but, in view of all the testimony in the case, it cannot be held that the agreement set up as contained in the letters is proved with sufficient certainty to make it the foundation of the decree made by the Circuit Court.

It is proper here to refer to another matter.    At the time of Sanford's death, in May, 1857, he was an equal partner with Pierre Chouteau, Jr., in the firm known as P. Chouteau, Jr., & Co., of New York; and he was also a partner, together with Pierre Chouteau, Jr., and three other persons, in the firm of P. Chouteau, Jr., Sanford & Co.    In October, 1858, negotiations were begun between P. Chouteau, Jr., and Messrs. Barlow and Gebhard, as executors of Sanford, for a compromise of the affairs of those two firms.    The executors, at the time, claimed that they had a right to a receivership of the assets of all the firms in which Mr. Sanford had been interested.    On October 13th, 1858, Chouteau, being in New York, prepared and verified a petition, addressed to the Surrogate of New York County, wherein it was stated that the business of P. Chouteau, Jr., & Co., of New York, had resulted in heavy losses, owing to unfortunate operations undertaken in the lifetime of Sanford; that the business of P. Chouteau, Jr., Sanford & Co. had produced large profits; that the accounts of P. Chouteau, Jr., & Co., of New York, had been made up as accurately as it could be done; that, under the most favorable aspect, there would, on the winding up of the affairs of that

firm, remain an indebtedness from Sanford to the petitioner, of not less than $363,323,61; that the amount which Sanford's estate would receive from the firm of P. Chouteau, Jr., Sanford & Co. would not exceed $198,558.06; that the petitioner was willing to accept the balance of the share of the estate of Sanford in the assets of the firm of P. Chouteau, Jr., Sanford & Co., in compromise and satisfaction of all his claims against the estate of Sanford; and that this compromise would result in an advantage to the estate of Sanford in a sum not less than $164,765.55. The petition was not presented to the Surrogate, but the negotiations were continued, and, in October, 1859, the executors of Sanford presented a petition to the Surrogate, verified by Mr. Barlow, containing the same statements as the Chouteau petition, and, by an order made in November, 1859, by the Surrogate, the executors were authorized to carry out the compromise on the terms above mentioned, as is stated in the bill in this suit. Then Chouteau, on December 1st, 1859, executed the release stated in the bill. That release contained at its close this clause:

"Nothing herein contained is to affect the rights which the said Pierre Chouteau, Junior, now has, either as surviving partner or by assignment, to collect all the assets of any firm formerly existing at St. Louis, in the State of Missouri, in which the said John F. A. Sanford was formerly a partner, for his own sole use and benefit, according to the terms agreed upon on the retirement of said John F. A. Sanford from said firms, or to affect or impair the right of the said Pierre Chouteau, Junior, to said assets."

The executors of Sanford knew, from this reference in the release of December 1st, 1859, that some terms had been agreed upon on the retirement of Sanford from the St. Louis firm. If the letters in their possession showed as distinctly as is now claimed what those terms were, it was easy to ascertain those terms from the letters. Instead of doing so, we find Gebhard, in his letter to Maffitt of September 15th, 1860, asking Maffitt to furnish the executors with a copy of the agreement with Sanford referred to in Chouteau's release in De-

cember, 1859, as having been made when Sanford retired from the St. Louis firm.

As the case of the plaintiffs depends upon their affirmatively establishing the agreement set up, what most directly bears upon its existence has been especially alluded to. But the whole course of the evidence in the case fortifies the conclusion at which we have arrived. We can, however, only summarize it. Sanford at all times regarded himself as a party in interest in the winding up of the affairs of the St. Louis firm, and of the "outfits" in the charge of Borup and Sibley. He never claimed any independent interest in the Minnesota lands. The other copartners, after 1852, sent to him accounts of the affairs of the firm, and treated him as interested in its liquidation and entitled to know about such accounts. The arrangement really was that the "outfits" in the Upper Mississippi under the charge of Borup and Sibley, and which were part of the business of the dissolved firm, should continue to be carried on as part of that business till they could be wound up. All lands in Minnesota were an outcome of those outfits, and were thus a part of the assets of the firm. Sanford's interest in those outfits was continued, but it remained subject to the debts of the outfits and to the debts of the firm. Pierre Chouteau, Jr., acted always in accordance with that view. His son, Charles P. Chouteau, always had that understanding of the arrangement. The clause before cited, at the end of the release of December 1st, 1859, in saying that the release is not to affect the rights which Chouteau "now has" to collect all the assets of the St. Louis firm for his own use and benefit, or to affect his right to those assets, may be very well satisfied by applying the word "now" to the condition of things then existing, and to the claims set forth in the complaint in the suit in the State court of Minnesota, brought in February, 1861. He had individually advanced large sums, before that time, to pay the debts of the firm, and undoubtedly contemplated a deficiency of assets, including the real estate in Minnesota. That real estate was then held by him as part of the assets of the dissolved firm, and he always afterwards honestly and faithfully treated it as held by him in trust to liquidate the debts.

of that firm. It was substantially the only resource in his hands in December, 1859, to repay him his advances. If the two letters then in the possession of Sanford's executors really showed such an agreement as they now claim, it is incredible that they would have accepted the release from Chouteau, with its comprehensive reservation of assets to Chouteau, and not have insisted on excepting from the assets the Minnesota real estate, which at that time was clearly assets of the firm. The entries in the books kept at St. Louis confirm the foregoing view.

On the whole case, we are of opinion, that, after the dissolution of the St. Louis firm, the members other than Sanford were entitled to collect and dispose of all its assets, including the Minnesota "outfit" and the Minnesota lands, to liquidate its affairs, without the interference of Sanford; that all claim on their part against Sanford individually was relinquished, leaving recourse only to those assets; and that, if there should be any surplus of those assets, after paying the debts of the firm and the advances of any of the other partners therefor, Sanford's executors would be entitled to his proper proportion of such surplus.

No judicial accounting has been had on the basis of the rights of the parties as we have defined them. The bill prays that the defendants may account touching the affairs and property of the copartnership and touching the proceeds of any such property. We think the plaintiffs are entitled to such an accounting, and are not barred from it by laches or by the operation of any statute of limitations. If necessary, the Circuit Court can, in its discretion, allow the pleadings to be amended, with a view to the attainment of justice, on the principles we have laid down. We do not deem it proper now to indicate any rule of accounting in respect to the lands which were not sold and conveyed by Charles P. Chouteau and Julia Maffitt to parties other than the representatives of Pierre Chouteau, Jr., Sarpy and Sire, but leave that question to be determined by the Circuit Court, on full consideration. As to the lands which were sold and conveyed to parties other than such representatives, the liability should be only for the sums

actually realized in good faith from the sales. The accounting may include the other remaining assets of the firm, if any.

*The decree of the Circuit Court is reversed, and the case is remanded to that court, with direction to enter a decree in accordance with this opinion, and to take such further proceedings as may be in conformity therewith.*